IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
THIRD DIVISION

FRANCES MORRIS FINLEY                                           PLAINTIFF

VS.                     CASE NO. CV-2013-_____

RICHARD PARKER EVANS, M.D.                                      DEFENDANT

COMPLAINT

**COMES NOW** the Plaintiff, Frances Morris Finley, by and through her attorneys, Hurst, Morrissey & Hurst, P.L.L.C., through Q. Byrum Hurst and Justin B. Hurst, and for her Complaint against the Defendant, Richard Parker Evans, M.D., herein, states and alleges:

I.

PARTIES

1. Ms. Finley is a resident of Pulaski County, Arkansas and has been continually through the course of her treatment by the Defendant, Dr. Richard Parker Evans.

2. Dr. Evans was at all times during the course of his treatment of Ms. Finley a resident of Pulaski County, Arkansas and an employee of the University of Arkansas School of Medical Sciences ("UAMS"). Dr. Evans assumed his position at UMAS in 2006 as Chief, Adult Reconstruction; Director, Center for Hip and Knee Surgery; and Associate Professor in the Department of Orthopaedics.

3. Dr. Evans's specialty is in hip and knee surgery.

## II.

## JURISDICTION AND VENUE

4. This Court has jurisdiction of the subject matter and the parties to this cause of action, and venue properly lies in this court.

## III.

## FACTUAL ALLEGATIONS

5. Ms. Finley first contacted Dr. Evans concerning her knee problems on April 21, 2008, in the Orthopaedic Clinic at UAMS. After two more appointments on July 7, 2008 and April 13, 2009, a decision was made to perform bilateral total knee arthroplasty ("TKA").

6. At the first of these appointments, Ms. Finley brought to Dr. Evans's attention that she had multiple allergies and asked Dr. Evans if it were possible for her to be allergic to the implants used. Dr. Evans responded that no one was allergic to these implants.

7. On May 28, 2009, Ms. Finley was admitted to UAMS for the first TKA surgery on her right knee. Under Dr. Evans's supervision, the surgery was performed by Dr. Brant Sachleben, a resident at UAMS.

8. On May 29, 2009, again under Dr. Evans's direct supervision, Dr. Robert Cercek, another resident at UAMS, performed a second TKR surgery on Ms. Finley's left knee.

9. On May 31, 2009, again with Dr. Evans present, Dr. Cercek performed additional surgery to remove a "foreign object" from Ms. Finley's right knee. It was identified to be the tip of the drain tube.

10. The implants and bone cement used in the surgery on May 28, 2009 were: Antibiotic Simplex bone cement distributed by Stryker; Biomet Series A Standard Patella; Vanguard PS Open Box Femoral 65 mm right interlock; Biomet Interlock 71 mm fixed I Beam Tibial Plate with interlocking bar made of CO-CR-MO alloy; Biomet Vanguard DCM PS Plus 14mm x 71/75mm tibial bearing ARCOM UHMWPE.

11. The implants used in the May 29, 2009 surgery were: Biomet Cobalt G HV bone cement 40/20 Softpac System (2 packs); Biomet Series A Standard Patella 37mm, 3 1/4 pegs; Biomet Vanguard PS Open Box Femoral 62.5mm Left Interlock, made of Co-CR-MO alloy; Biomet Vanguard DCM PS plus 18mm x 71/75 Tibial Bearing ARCOM UHMWPE; There is no record of the make of the tibial plate used in this surgery in Ms. Finley's medical records.

12. On September 21, 2009, Ms. Finley consulted Dr. Evans about severe pain in her right tibia below the patella. Dr. Evans diagnosed the problem as tendinitis and prescribed 500mg Aleve and ordered some blood work.

13. On November 30, 2009, Ms. Finley reported to Dr. Evans extreme pain at night in her left hip. Dr. Evans diagnosed bursitis. He administered a steroid shot in the bursa, alleviating not only the hip pain but also pain and swelling in Ms. Finley's knees. When the steroid wore off, the pain in the knees recurred.

14. In February 2010, Ms. Finley began experiencing increased pain horizontally along the joint lines where the tibias meet the femurs of both knees.

She also developed a hive-like rash or eczema over the surgical area on both knees.

15. On March 15, 2010, Ms. Finley again consulted Dr. Evans, showing him the rash and pictures that she had taken of it. Dr. Evans, in his Outpatient Notes, expressed concern regarding the "family history of allergies" and the possibility that Ms. Finley "could be having a reaction to her implants." Dr. Evans further recorded that he "would certainly think about revising one of the knees to a tibial baseplate with her Oxinium femoral component to see if that would help her situation." Dr. Evans asked Ms. Finley to return to the clinic in June for further evaluation.

16. On June 21, 2010, Ms. Finley returned to see Dr. Evans. After examining Ms. Finley, Dr. Evans ordered a bone scan of both knees on June 24, 2010.

17. On June 24, 2010, the bone scans were conducted in the Radiology Department at UAMS. The reported reading was as follows: "Impression: Three-phase bone scan of the knees suggestive of loosening of the tibial component of the left knee prosthesis."

18. On July 12, 2010, Ms. Finley saw Dr. Evans and reviewed the results of the bone scans with her. Dr. Evans noted that the left knee was "point tender both medially and laterally, and the knee does have some laxity with varus and valgus stress." The imaging showed the left tibial baseplate had shifted and there was some subsidence of the tibia. At this time, Dr. Evans explained to Ms. Finley that it was absolutely necessary to revise the left TKA with a revision tibial

stem, and, at the very least, to replace the polyethylene insert on the right knee. There was no discussion at this time about the brand or metal content of the implants in Ms. Finley's knees, or what brand and metal content of the implant Dr. Evans intended to use in the partial revision. There was also no discussion about the efficacy of a partial revision as opposed to a full revision.

19. On July 15, 2010, realizing that she had not been fully informed regarding the planned surgery, Ms. Finley called Dr. Evans, who was reportedly out of town and unavailable. Ms. Finley accordingly faxed her concerns to Dr. Evans's nurse, Hazel Leslie.

20. During an appointment on August 9, 2010, Ms. Finley personally restated to Dr. Evans the concerns expressed in the fax to his nurse, including her concerns about her possible metal allergy. Dr. Evans made the following written assessment of Ms. Finley's condition: "Failure of Bilateral Total Knee Arthroplasty." Ms. Finley at that time agreed to Dr. Evans's suggestion that she undergo a partial revision of the left knee and a replacement of the polyethylene insert on the right knee. Dr. Evans assured Ms. Finley that he would use a tibial plate in the left knee made of titanium – a neutral metal to which Ms. Finley had shown no previous allergic reactions. Dr. Evans reported that this implant would match her femoral component. At no time was Ms. Finley told she currently had exclusively cobalt and chrome implants in both knees. Moreover, at no time was she given the choice of undergoing full revisions, replacing the entire implants with hypoallergenic knees.

21. On September 2, 2010, Ms. Finley underwent a partial revision of her left knee implant. Dr. Evans personally performed the surgery.

22. On September 3, 2010, Ms. Finley underwent a partial revision of her right knee implant. Again, Dr. Evans personally performed the surgery.

23. In performing the partial revisions, Dr. Evans chose to replace only the tibial portions of the implants, leaving the femur portions of the prostheses intact.

24. The implants used on September 2, 2010 were; Biomet Vanguard Interlock 75 mm Fixed Beam Tibial Plate with locking bar made of CO-CR-MO alloy; Vanguard DCM PS Plus 24mm x71/75mm Tibial Bearing ARCOM UHMWPE; Stryker Antibiotic Simplex Bone Cement.

25. The implants used in revision surgery performed on September 3, 2010 on Ms. Finley's right knee were: Biomet Interlock 71mm Fixed Beam Tibial Plate with locking bar made of CO-CR-MO alloy and a Vanguard DCM PS Plus 24mm x 71/75mm tibial bearing ARCOM UHMWPE. Stryker Antibiotic Simplex Bone Cement was also used.

26. The UAMS coding summary for the September 2, 2010, surgery and the September 3, 2010 surgery shows the secondary diagnosis to be, among other things, an abnormal reaction to the artificial implant.

27. On November 1, 2010, Ms. Finley saw Dr. Evans at her regular 6-weeks checkup. She reported ongoing problems with itching and rashes. Noting that Ms. Finley had "diffuse erythematic rash on her legs, abdomen and back," Dr. Evans referred Ms. Finley to Dr. Charles Davis, a dermatologist at UAMS.

28. Ms. Finley saw Dr. Davis on November 9, 2010. He prescribed a topical ointment for the rash.

29. On April 25, 2011, Ms. Finley saw Dr. Evans for treatment of her continuing pain and a possible allergic reaction. Dr. Evans ordered some blood tests to evaluate any inflammation and referred Ms. Finley to Dr. Elizabeth Russell, a rheumatologist at UAMS. The intake nurse at this point informed Ms. Finley that Dr. Evans would soon be leaving the state to pursue employment elsewhere.

30. On June 2, 1011, Ms. Finley, saw Dr. Elizabeth Russell, who could not find any evidence of an autoimmune disease that would cause the symptoms Ms. Finley had been suffering.

31. In October 2011, Ms. Finley again suffered a full body rash. She contacted her primary care physician, who diagnosed it as probably caused by a chemical or medicine allergy. He prescribed a steroid injection to alleviate the symptoms.

32. On October 14, 2011, Ms. Finley, in an attempt to resolve her growing knee problems, saw Dr. Richard Nicholas, Chairman of the Orthopaedic Department at UAMS. Dr. Nicholas examined Ms. Finley's knees and suggested "an allergy or immunology consultant may be helpful to rule out the possibility of a significant deep knee allergic reaction."

33. In early December 2011, Ms. Finley contacted Dr. Gordon Newbern, an orthopaedic surgeon in Little Rock to whom she had been referred by Dr. Harold Hedges. Dr. Newbern suggested that before anything else was

done, she see Dr. Blake Scheer, an allergist at Little Rock Allergy and Asthma Clinic, to have patch tests done to test for allergy to metals.

34. On December 19-23, 2011, Dr. Scheer performed patch tests on Ms. Finley, specifically checking for allergy to any metals and bone cements ordinarily used in orthopaedic surgery. The tests showed a positive reaction to potassium dichromate – a major component compound in her knee implants.

35. On January 13, 2011, during a second visit to Dr. Newbern, Ms. Finley complained that her left knee was deteriorating rapidly. Both Dr. Newbern and Ms. Finley agreed that it would be necessary to replace at least the left knee. Dr. Newbern recommended a Smith & Nephew knee implant that has never been documented as triggering an allergic reaction.

36. On March 5, 2012, Dr. Newbern performed a total revision of both the femoral and tibial components in the left knee, using a Smith & Nephew prosthesis made of Oxinium, which contains no potassium dichromate.

37. On July 23, 2012, Dr. Newbern replaced the right knee implant using the same components.

## COUNT I

### NEGLIGENCE

38. After the original surgeries, Ms. Finley exhibited several physical signs that would lead a cautious physician to further look into what was causing the problems: (1) failure to heal and be pain-free in the same time frame as the vast majority of patients, (2) a large area of eczema over the surgical areas on both knees appearing less than ten months after the surgery, (3) horizontal pain across the tibial plateau on both knees eight months after surgery, (4) a bone

scan that showed significant bone resorption on the tibial component on the left knee ten months after surgery, and (5) significant pain in the right knee laterally above the femoral component. Despite these warning signs of allergic reaction to the initial implants, in performing the partial revisions, Dr. Evans chose to use the same variety of Biomet cobalt and chrome prostheses on each knee.

39. Despite Dr. Evans's previous diagnosis regarding what was required, neither of these tibial implants had a revision tibial stem.

40. In performing the partial revisions, Dr. Evans failed to align the components to the standards in the profession, thereby causing Ms. Finley continued pain when walking. He further negligently chose to use a tibial component that had a considerable overhang, causing the ligaments to rub against it when moving and causing pain.

41. Despite numerous conversations concerning her problems with unusual allergies, Dr. Evans chose to ignore the documented history she had of chemical and medical allergies. Despite the fact that a patch test for allergic reactions to metal and bone cement allergies existed, Dr. Evans chose to not even attempt to find someone who would perform those tests and to at least take into consideration the results.

42. Dr. Evans was negligent in that even if he chose to ignore Ms. Finley, the rash, the pain, the bone scan, he could have opted to just do full revisions using the Smith & Nephew knees made of oxinium that were acknowledged to be free of cobalt and chrome and had never been documented as posing any risk of allergic reactions.

43.     Had Dr. Evans correctly diagnosed the problem before doing the partial revision surgeries on September 2 and 3, 2010, and had he replaced the implants totally with prostheses that were shown not to be prone to allergic reactions, and had he properly placed the new implants so there was no overhang and chosen to build up the tibial plate with metal augments instead of using an oversized polyethylene insert, Ms. Finley would not have suffered the injuries she has had to endure.

44.     In providing medical and surgical services to Ms. Finley, Dr. Evans had the duty to exhibit and exercise the degree of skill and learning ordinarily possessed by orthopaedic surgeons specializing in total knee replacement surgery, practicing in the same or similar locality and under the same or similar circumstances. Dr. Evans failed to fulfill this duty.

## COUNT II

### FAILURE OF INFORMED CONSENT

49.     The Authorization & Consent to Surgical & Medical Procedures Form used by UAMS Medical Center, states:

> You have the right to be informed about your condition and the recommended surgical, medical or diagnostic procedure to be used. This information should help you made the decision whether or not to undergo the procedure/surgery after being informed of the potential risks, benefits, complications and alternatives of the procedure involved.

50.     At no time during her treatment did Dr. Evans ever inform Ms. Finley of his intent to replace her failed implants with implants containing the same metal components. On the contrary, he expressly told her on August 9, 2010, in response to her expressions of concern about metal allergies, that he

was putting in tibial plates made of titanium – a metal to which she reported having had no allergic reactions – to match titanium femoral components components already in place. This representation was in all respects consistent with Dr. Evans's own March 15, 2010 outpatient notes, in which he expressed concerns about metal allergies and contemplated installing hypoallergenic tibial implants to match already implanted hypoallergenic femoral components. Neither of Dr. Evans's representations on August 9, 2010 was true. Rather than doing what he had himself planned to do and had informed Ms. Finley he would do, Dr. Evans implanted components similar in all material respects to those that had failed following the first set of operations. As a result, Ms. Finley was forced to have a third set of operations to replace implants to which, as both she and Dr. Evans had suspected, she was allergic.

51. At no time during Ms. Finley's treatment did Dr. Evans ever explain that there could be problems with doing just a partial revision and the pros and cons of doing either a partial or a full revision of each knee, as she was subsequently required to undergo. Had Ms. Finley been adequately informed of her need for full knee replacements, she would not have undergone the partial replacements Dr. Evans performed.

## DAMAGES

52. As a proximate result of the acts of medical negligence by Dr. Evans, Ms. Finley is entitled to recover damages, in an amount to be set by a jury in excess of the amount for federal court diversity jurisdiction, for the injuries to her knees, including, but not limited to:

    a.    Conscious pain and suffering and mental pain, suffering and anguish by Ms. Finley in having to spend two years trying to find a solution to her medical problems, and not knowing then and not knowing now, if the corrective surgery will return her to a pain-free, normal ability to walk, work, and engage in her normal activities.

    b.    Excessive medical expenses and travel expenses in trying to find someone to solve the medical problem.

    c.    The value of having been effectively denied three years of her life, in which she reasonably should have expected to be able to do the ordinary activities that she had previously enjoyed.

    d.    All other damages recoverable under the law to be set by a jury in excess of the amount required for federal court diversity jurisdiction against the defendant.

## VI.

## JURY TRIAL DEMANDED

53. The plaintiff respectfully demands a jury of twelve (12) persons to try this case.

## VII.

## CONSTITUTIONAL OBJECTIONS TO THE
## CIVIL JUSTICE REFORM ACT OF 2003 RESERVE

59. In the 2003 Session of the Arkansas General Assembly, the Legislature passed an Act entitled *The Civil Justice Reform Act of 2003* ("The

Act"), which was signed by the Governor and became effective on or about March 27, 2003, and is codified presently at A.C.A. 1655-201, *et seq*. This is an action for medical negligence accruing after the effective date of the Act.

60. The Act obviously violates Article 5, § 32 of the Arkansas State Constitution, which plainly prohibits legislative limitations on recoveries and Article 4, §§ 1 and 2 of that Constitution, which prohibit legislative incursions on judicial power. Additionally, the Act violates the constitutional scheme that formally worked to limit governmental incursion on common law rights and limited legislative power to assist special interests. This scheme is embodied in provisions in Article 2, §§ 4, 13, and 21, recognizing the right to petition the government for redress, Article 2, § 13, guaranteeing the right of every injured person to a remedy, Article 2, § 7, prescribing a right to a jury trial which "shall remain inviolate"; Article 2, §§ 13 and 21, mandating due process and application of the law of the land; Article 2, §§ 3, 18, and 21, recognizing that all citizens shall receive equal treatment and the related Article 5, § 25, limiting unequal treatment to times when it is justified; requiring "that where a general law can be made applicable, no special law shall be enacted."

61. Act 649 of 2003 provides various and sundry onerous and burdensome provisions, which include but are not limited to the requirement of specialty affidavits prior to instituting suit, limitations on the amount of punitive damages, provisions creating "phantom defendants," the abrogation of traditional rights to plea joint and several liability, and joint and several liability, to name a few. Several of these provisions have already been held unconstitutional by the

Arkansas Supreme Court, and it is the position of the Plaintiff that the entire Act is unconstitutional and the fact that Plaintiff has attempted to comply with some of its provisions in order to not delay the proceedings herein are not to be construed as a waiver thereof.

62. In the event that it is alleged that the Plaintiff has not complied with any provision of Act 649, the Plaintiff prays for a declaratory judgment that the Act is itself unconstitutional, in whole or in applicable parts.

63. Plaintiff's First Set of interrogatories and Request for Production of Documents, and First set of Requests for Admission, are served concurrently with this Original Complaint.

**WHEREFORE**, Plaintiff, Frances Morris Finley, respectfully prays that they have and recover judgment from and against the Defendant in an amount as apportioned by an appropriate and constitutional method by a duly constituted jury, for compensatory damages as the proof may establish in an amount to be set by the jury in excess of the amount required for federal court diversity jurisdiction, against the defendant, for all elements of damages as set forth herein and as allowed by law, plus their costs and all other relief to which they may be entitled.

Respectfully submitted,

Frances Morris Finley, Plaintiff

By: /s/ Q. Byrum Hurst
    Q. Byrum Hurst
    Arkansas Bar No. 74082
    Justin B. Hurst
    Arkansas Bar No. 2005021
    Hurst, Morrissey & Hurst, PLLC
    518 Ouachita Avenue
    Hot Springs, Arkansas 71901
    (501) 623-2565 Telephone
    (501) 623-9391 Facsimile